IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

ANTHONY FLEMING,
    Defendant.

Criminal No.: ELH-08-086

**MEMORANDUM OPINION**

Anthony Fleming was one of 28 defendants indicted in February 2008 on multiple charges. ECF 1.  In April 2010, a jury convicted Fleming of one count of conspiracy to engage in a racketeering enterprise; one count of conspiracy to distribute fifty grams or more of cocaine base, *i.e.*, "crack" cocaine; and one count of possession with intent to distribute fifty grams or more of cocaine base.  ECF 964.  In July 2010, Judge William D. Quarles, Jr., to whom the case was then assigned, sentenced Fleming to life imprisonment.  ECF 1065 (Judgment).[1]  In doing so, Judge Quarles concluded that Fleming had murdered Lamont Jackson, and that this murder was related conduct for purposes of the Sentencing Guidelines ("Guidelines" or "U.S.S.G.").  ECF 1736-2 (Sentencing Tr.) at 24.  Fleming is currently serving his sentence at USP McCreary.  *See* ECF 1736-9.

While self-represented, Fleming filed a "Motion for a Sentence Reduction Pursuant to Section 404 of the First Step Act."  ECF 1658.  It is supported by one exhibit.  ECF 1658-1. Through appointed counsel (ECF 1685), Fleming filed a "Supplemental Motion in Support for Request for Sentence Reduction Under Section 404 of the First Step Act and Motion for

---

[1]  The case was reassigned to me on January 29, 2016, due to the retirement of Judge Quarles. *See* Docket.

Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i)."  ECF 1734.  It is supported by several exhibits.  ECF 1734-1 to ECF 1734-9.  I shall refer to ECF 1658 and ECF 1734 collectively as the "Motion."   In the Motion, Fleming asks the Court to reduce his sentence to time served.  ECF 1738 at 18.

The government opposes the Motion.  ECF 1752 (the "Opposition").  In the alternative, however, the government argues that the Court should reduce Fleming's sentence to 27 years of imprisonment, rather than time served.  *Id.* at 22-24.  Fleming has replied.  ECF 1757 (the "Reply").   In addition, the Court has received correspondence from Fleming and numerous individuals on his behalf.  *See* ECF 1759; ECF 1768; ECF 1769; ECF 1770; ECF 1777; ECF 1808; ECF 1833; ECF 1834; ECF 1835.

No hearing is necessary to resolve the Motion.  For the reasons that follow, I shall grant the Motion in part, and reduce Fleming's life sentence to a total term of 30 years of imprisonment.

## I.  Background[2]

On February 21, 2008, a grand jury indicted Fleming and 27 codefendants.  ECF 1 (the "Indictment").  Specifically, the Indictment charged Fleming with conspiracy to engage in a racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One); conspiracy to distribute and possess with the intent to distribute fifty grams or more of cocaine base, in violation of 21 U.S.C. §§ 846 and 853 (Count Two); and possession with intent to distribute fifty grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 851 (Count Four).  *Id.*; *see* ECF 1065 (Judgment); *United States v. Mouzone*, 687 F.3d 207, 212 (4th Cir. 2012), *cert.*

---

[2] I note that numerous filings in this case are not electronically accessible.  The first electronic filing appears on March 24, 2008, at ECF 239.

2

*denied*, *Fleming v. United States*, 568 U.S. 1110 (2013).  Count Four, for which only Fleming was charged, arose from conduct that occurred on April 24, 2007, described below.

Before trial, the government provided notice under 21 U.S.C. § 851 that, as to Count Two and Count Four, it would introduce evidence that the offense involved an aggregate weight of 50 grams or more of cocaine base or crack and, if convicted, the offense would require a mandatory minimum sentence contemplated in 21 U.S.C. § 841(b)(1)(A).  ECF 907 at 1-2.  In the alternative, if the offense involved an aggregate weight of 5 grams or more, it would require a mandatory minimum penalty under 21 U.S.C. § 841(b)(1)(B).  *Id*.  Furthermore, as to Count Two and Count Four, on the basis of the defendant's prior qualifying convictions, the government gave notice of its intent to seek the enhanced maximum sentence and enhanced mandatory minimum sentence, as provided in 21 U.S.C. §§ 841(b)(1)(A) and 851.  *Id*. at 2-3.

Fleming and one codefendant, Travis Mouzone, proceeded to an eight-day jury trial in March and April 2010.  *See* ECF 913 to ECF 964.  On April 16, 2010, the jury convicted Fleming of the three counts that pertained to him.  ECF 964.[3]  As to Count One, the jury found that the distribution of crack cocaine, distribution of cocaine, and robbery were racketeering activities that were objectives of the conspiracy.  *Id*. at 1.  However, the jury found that distribution of heroin and marijuana were not objectives of the conspiracy.  Moreover, the jury made no findings as to whether conspiracy to commit first degree murder; conspiracy to commit second degree murder; attempted first degree murder; attempted second degree murder; first degree murder; or second degree murder were racketeering activities that were objectives of the conspiracy.  *Id*. at 1-2.  As to Count Two, the jury found that the conspiracy involved fifty grams or more of cocaine base.

---

[3] Mouzone was convicted of Count One, the only count for which he was charged.  *See* ECF 966.

*Id*. at 2.  And, as to Count Four, the jury found that the offense involved fifty grams or more of cocaine base.  *Id*. at 2-3.

The following summary of the evidence at trial is drawn from the government's submission for the Presentence Report (ECF 1736-3, the "PSR") and from the Fourth Circuit's decision on appeal.  *See Mouzone*, 687 F.3d at 212-13.

Fleming and Mouzone were members of Tree Top Piru ("TTP"), a "set," or subdivision, of the Bloods gang.  *Id*. at 212; ECF 1736-3, ¶ 10.  TTP developed within the Maryland prison system, but expanded outside of the prison system to locations throughout Maryland, including Baltimore.  *Mouzone*, 687 F.3d at 212; ECF 1736-3, ¶¶ 10, 11.  TTP members were expected to advance within the gang by "putting in work."  *Mouzone*, 687 F.3d at 212; ECF 1736-3, ¶¶ 10-12. "Putting in work" entailed, *inter alia*, generating revenue for the gang through drug trafficking, robbery, and other crimes, and committing acts of violence, such as murders and stabbings, against other prisoners and members of rival gangs.  *Mouzone*, 687 F.3d at 212; ECF 1736-3, ¶ 12.

Fleming and Mouzone participated in TTP activities in the Essex area of Baltimore County, Maryland.  "As part of their membership [in TTP], they participated in the gang's drug-trafficking and other illicit activities."  *Mouzone*, 687 F.3d at 212.

At trial, two TTP cooperating witnesses, as well as a third witness who was not a member of TTP but who infiltrated the organization in cooperation with investigating agents, identified Fleming as a drug dealer.  ECF 1736-3, ¶ 13.  These witnesses knew Fleming by the nickname "Mo Easy."  *Id*.  TTP correspondence identified "Mo Easy" as a ranking TTP member, or what is known as an "SP."  *Id*.  In addition, law enforcement witnesses described encountering Fleming, along with several other TTP members, during a search of an address in Essex referred to as the "headquarters" for TTP.  *Id*.

4

On April 24, 2007, Fleming was arrested by officers of the Baltimore Police Department. *Id.* ¶ 19; *Mouzone*, 687 F.3d at 213. The arrest occurred after officers "observed a plastic baggie with a white rock substance protruding from a cell phone case on Fleming's hip." *Mouzone*, 687 F.3d at 213. Seizure of the cell phone case revealed that it contained two plastic bags of cocaine base, amounting to 55 grams. *Id.*; ECF 1736-3, ¶ 19. At the time, Fleming was 21 years old. *See* ECF 1736-3 at 1.

The government also introduced evidence regarding the participation of Fleming and Mouzone in the murders of Lamont Jackson and Marquel Smith. *Mouzone*, 687 F.3d at 212-13.

On November 17, 2006, Jackson was found "lying and bleeding" at the rear of his house on Streeper Street in Baltimore. ECF 1736-3, ¶ 25. Investigators found 9mm shell casings near the front door of the home. *Id.* "[T]he scene indicated that Jackson had answered his door, and was then shot, chased through his home, and finally murdered near the rear of the home." *Id.*

The Fourth Circuit said in *Mouzone*, 687 F.3d at 212-13:

> At trial, TTP members Terrence Brady and Troy Smith testified for the government as to statements by Fleming that he shot and killed Jackson in retaliation for Jackson's testimony against another TTP member, Antwoine Gross (aka Shooter). Another TTP member, Kowan Brice, provided testimony that he drove Fleming and Mouzone to an area near Streeper Street in a Dodge Durango. Brice claimed that he "split off" from Fleming and Mouzone and went to a convenience store. After hearing noises he thought to be gunshots or fireworks, he returned to the Durango, where he met Fleming and Mouzone, and drove them back to Essex.

Smith was shot and killed at his home on December 17, 2016. He was not a member of TTP. Rather, Smith was selling marijuana in Essex and refused to pay a portion of his proceeds to the gang. *Id.* at 213; ECF 1736-3, ¶¶ 20-22. Mouzone provided two 9mm firearms to two TTP members, who accompanied Mouzone to Smith's house and killed Smith. 687 F.3d at 213. "Brady testified that one of the firearms Mouzone provided was the same firearm he had seen Fleming holding at TTP's headquarters in November." *Id.* According to the PSR, "[a] key piece of

evidence linking the Jackson murder to the Smith murder . . . was the fact that the same 9mm handgun was used to commit both murders."  ECF 1736-3, ¶ 26.

As noted, the jury returned a guilty verdict on April 16, 2010, as to all three counts in which Fleming was charged.  ECF 964.  After the verdict, Fleming moved for a new trial.  ECF 974.  He argued that the court improperly admitted a narcotics weight report from a non-testifying chemist, in violation of the Sixth Amendment's Confrontation Clause.  *Id*. at 2-4.  And, he maintained that the court had erred in denying his motion, made during trial, to sever Count Four from Counts One and Two, on the ground that there was no evidence of a relationship between the drug distribution of April 24, 2007, and the overall conspiracy.  *Id*. at 5-7.  Judge Quarles held a hearing regarding the motion on July 9, 2010, and denied it the same day in a Memorandum Opinion.  ECF 1060.[4]

Prior to sentencing, the U.S. Probation Office prepared a PSR.  But, it did not apply the murder cross-reference.  Instead, the PSR calculated a base offense level for Fleming of 30, with a criminal history category of IV, resulting in a Guidelines range of 135 to 168 months of imprisonment.  Moreover, the calculation also did not take into account the 20-year mandatory minimum sentence sought by the government based on Fleming's prior qualifying offense.  *See* ECF 1035 at 8-9; ECF 1047; ECF 1734 at 4; ECF 1736-2 at 16.

In a letter to counsel on July 6, 2010, Judge Quarles indicated that he had asked the Probation Office to prepare revised calculations "on the assumption that [Fleming] was a participant in the murder[]" of Lamont Jackson.  ECF 1047 (the letter).  A revised PSR was

---

[4] I could not locate a separate order that pertains to ECF 1060.

prepared. *See* ECF 1736-3.[5]  Judge Quarles ultimately determined that the murder was relevant for sentencing.  Therefore, I recount information gleaned from the revised PSR.  *See* ECF 1736-3.

At the time the PSR was prepared, Fleming was 24 years old.  *Id.* at 1.  The PSR explained that, per the Sentencing Guidelines for racketeering conspiracy, contained in U.S.S.G. § 2E1.1, the base offense level for Count One was the greater of 19 or the offense level applicable to the underlying racketeering activity.  *Id.* ¶ 36.  Furthermore, when there is more than one underlying racketeering offense, each act shall be treated as if it is contained in a separate count of conviction. *Id.* (citing § 2E1.1, cmt. 1).

To determine the offense level for the underlying racketeering activity, the PSR grouped Counts Two and Four ("Group One"), and placed the racketeering activity of robbery in a second group ("Group Two").  *Id.* ¶¶ 37, 43.  As for Group One, the PSR found a base offense level of 30 because the criminal activity involved more than 50 grams of cocaine base.  *Id.* ¶ 37.  But, the base offense level increased to 43 by application of the murder cross-reference under U.S.S.G. §§ 2A1.1 and 2D1.1(d)(1), "because a victim was killed under the circumstances that would constitute murder."  *Id.*  As for Group Two, the PSR found a base offense level of 20, but again applied the murder cross-reference, which yielded a base offense level of 43.  *Id.* ¶ 43.  Thus, the adjusted offense level was 43.  *Id.* ¶ 48.  And, based on the multiple count adjustment, U.S.S.G. § 301.4, the offense level was increased by two.  *Id.* ¶¶ 49, 50, 51.  This resulted in a combined adjusted offense level of 45.  *Id.* ¶ 54.

The PSR calculated a subtotal criminal history score of seven points, which was reduced to six under U.S.S.G. § 4A1.1(c) (counting a maximum of four one-point offenses).  *Id.* ¶ 63.

---

[5] The revised PSR was not docketed at the time. But, it is an exhibit to the supplemental motion. *See* ECF 1736-3.

Under § 4A1.1(d), two points were added because Fleming was on probation at the time he committed the instant offense. An additional point was added under § 4A1.1(e) because Fleming committed the instant offense less than two years following his release in a previous case. *Id.* ¶ 65. Therefore, Fleming had a total of nine criminal history points, which resulted in a criminal history category of IV. *Id.* ¶ 66.

In particular, in 2004, in the Circuit Court for Baltimore County, Fleming was convicted of possession with intent to distribute narcotics, and sentenced to two years, all suspended, and 18 months of probation. *Id.* ¶ 60. Multiple other counts were *nol prossed*. *Id.* On August 19, 2005, Fleming appeared in court for a violation of probation. *Id.* He was sentenced to time served, from September 14, 2004, to August 19, 2005, and probation was terminated as unsatisfactory. *Id.*

In 2006, in the Circuit Court for Baltimore County, Fleming was convicted of firearm possession, and sentenced to five years of incarceration, again suspended, and two years of probation. *Id.* ¶ 61. A violation of probation warrant was issued on January 4, 2008, which remained outstanding as of the time of the PSR. *Id.* Again, multiple other counts were *nol prossed*. *Id.* Finally, in 2006, in the Circuit Court for Baltimore City, Fleming was convicted of unlawful possession of CDS, as well as an open container offense. *Id.* ¶ 62. He was sentenced to one year of incarceration for the possession offense and six months, concurrent, for the open container offense. *Id.*

In addition, Fleming had three juvenile adjudications in the Circuit Court for Baltimore County from 2001 and 2002, each of which scored one point. *Id.* ¶¶ 56-58. Fleming was placed on probation for misdemeanor theft (*id.* ¶ 56); committed to the Department of Juvenile Justice for felony theft (*id.* ¶ 57); and committed to the Department of Juvenile Justice for unauthorized use. *Id.* ¶ 58.

The PSR noted that Count One had a statutory maximum of 20 years of imprisonment. *Id.* ¶ 74. Counts Two and Four each had a mandatory minimum term of 20 years of imprisonment and a maximum of life imprisonment. *Id.* ¶ 75. The mandatory minimum of 20 years was triggered under 21 U.S.C. §§ 841(b)(1)(A) and 851 by the 2004 felony narcotics conviction, as forecast by the government's pretrial § 851 notice (ECF 907). *See* ECF 1736-3, ¶¶ 60, 75. Based on an offense level of 45 and a criminal history category of IV, the Guidelines called for life imprisonment. *Id.* ¶ 76. However, the Guidelines range for Count One was 240 months, consistent with the statutory maximum. *Id.*

Fleming is 5'10" tall and, at sentencing, he weighed approximately 180 pounds. *Id.* ¶ 89. He described his physical health as "good." *Id.* ¶ 90. Fleming reported that he drank alcohol socially and smoked crack cocaine, beginning at age 18, several times per week. *Id.* ¶¶ 91, 92. His father did not have a role in his life. *Id.* ¶ 82. Due to his mother's financial problems, the family moved often and was frequently evicted during Fleming's childhood. As a result, he spent time in homeless shelters and foster care. *Id.* ¶ 84.

Sentencing was held on July 9, 2010. ECF 1063. At sentencing, Judge Quarles heard arguments concerning defendant's role in the murder of Lamont Jackson. He found that "it is more likely than not that Mr. Fleming killed Mr. Jackson and that that murder is relevant and related conduct in setting the guidelines range in this case." ECF 1736-2 (Sentencing Transcript) at 24-25; *see id.* at 29. He adopted the calculations in the revised PSR, and determined that the combined adjusted offense level was 45 and the criminal history category was IV. ECF 1066 (Statement of Reasons) at 1; ECF 1736-2 at 25. Judge Quarles also noted that Fleming was "subject to a mandatory [minimum] 20 year term on Counts Two and Four," given his prior felony drug conviction. ECF 1736-2 at 29.

Judge Quarles sentenced Fleming to 240 months (20 years) of imprisonment for Count One, and to concurrent sentences of life imprisonment for Count Two and Count Four.  ECF 1065 at 2.  He remarked: "The defendant's youth and lack of job skills and lack of employment history virtually guarantee his recidivism were freedom an option."  ECF 1736-2 at 29; *see* ECF 1066 at 4.  In addition, he ordered a period of supervised release of three years for Count One and ten years, concurrent, for Counts Two and Four.  ECF 1065 at 3.  He also recommended Fleming's participation in any substance abuse program for which he might be eligible.  *Id*. at 2.

On July 20, 2010, Fleming and Mouzone noted an appeal to the Fourth Circuit.  ECF 1075. Fleming argued, *inter alia*, that Judge Quarles erred in determining that the Lamont Jackson murder constituted relevant conduct for the purposes of calculating Fleming's Guidelines range; Judge Quarles improperly found that Fleming was subject to an enhanced mandatory minimum sentence based on a prior offense; and that the Fair Sentencing Act, which by that point had been enacted, should have been applied retroactively to his sentence.  *See* 687 F.3d at 220-22.

In a unanimous, reported decision of July 26, 2012, the Fourth Circuit rejected all of Fleming's arguments and affirmed the district court.  *Mouzone*, 687 F.3d 207; *see* ECF 1290.  In particular, as to the Jackson murder, the Fourth Circuit remarked: "When offenses are grouped under § 3D1.2(d), the district court considers as relevant conduct 'all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction.'" *Id*. at 220 (quoting U.S.S.G. § 1B1.3(a)(2)).  Furthermore, it noted that even though the jury declined to find that Fleming murdered Jackson, for purposes of sentencing, the District Court was entitled to make its own findings, supported by a preponderance of the evidence, regarding Fleming's conduct.  687 F.3d at 220 (citing *United States v. Montgomery*, 262 F.3d 233, 249 (4th Cir. 2001)).  As to the enhanced mandatory minimum, the Fourth Circuit held that the fact that the

prior drug conviction derived from an *Alford* plea did not bar application of the enhancement. 687 F.3d at 221.[6]  And, the Fourth Circuit rejected Fleming's argument that the Fair Sentencing Act applied to his case. *Id*. at 222.

The Fourth Circuit denied Fleming's petition for rehearing and rehearing en banc on August 21, 2012. ECF 1295.  The mandate issued on August 21, 2012. ECF 1297.  The Supreme Court denied certiorari on January 7, 2013.  *Fleming v. United States*, 568 U.S. 1110 (2013).

Following Fleming's appeal, he filed a motion to vacate his conviction under 28 U.S.C. § 2255.  ECF 1352; *see also* ECF 1354; ECF 1366; ECF 1397.  As amended, Fleming argued that his counsel was ineffective for failing to challenge certain evidence, and he challenged his sentencing enhancement under *Alleyne v. United States*, 570 U.S. 99 (2013).  *See* ECF 1454 at 7-11.  In a Memorandum Opinion (ECF 1454) and Order (ECF 1455) of June 22, 2015, Judge Quarles denied Fleming's § 2255 motion.

As noted, Fleming is currently incarcerated at USP McCreary.  *See* ECF 1736-9.  His Bureau of Prisons ("BOP") records reflect that he has received credit for the period of time between April 24, 2007, when he was arrested, and July 8, 2010, with several brief gaps in 2007.  *Id*. at 6.  According to the PSR, defendant was detained in federal custody as of March 24, 2008.  ECF 1736-3 at 1.

Fleming's BOP disciplinary records reflect 13 infractions while defendant has been in custody.  *See* ECF 1736-9 at 10-13; *see also* ECF 1734 at 13; ECF 1752 at 20-21.  In general, these

---

[6] Fleming had invoked *United States v. Alston*, 611 F.3d 219 (4th Cir. 2010), which barred a "'prosecutor's proffer of the factual basis for an *Alford* plea [from being] later . . . used . . . to identify the resulting conviction as an [Armed Career Criminal Act] predicate.'" *Mouzone*, 687 F.3d at 221 (quoting *Alston*, 611 F.3d at 227) (last alteration mine; others in *Mouzone*). The Fourth Circuit distinguished the cases on the ground that, in Fleming's case, the district court simply relied on the fact of conviction to determine that Fleming's conviction was a qualifying offense. *Mouzone*, 687 F.3d at 221.

were in the period between 2010 and 2014, and include offenses such as fighting, destroying property worth over $100, refusing to obey an order, and possessing a dangerous weapon.  *See* ECF 1736-9 at 10-13.  Since then, Fleming has had three offenses: refusing to obey an order in 2015, and two infractions for possession of alcohol in 2020.  *See id*. at 10.

Fleming's medical records indicate that he received two doses of Pfizer COVID-19 vaccine, with the second dose administered in April 2021.  *See* ECF 1736-5 at 51.  The records do not reflect receipt of a booster, however.

Fleming represents that, if released, he will be supported by family and friends.  ECF 1734 at 17-18; ECF 1757 at 6-7.  In particular, his brother will assist him in attending school to obtain his Commercial Driver's License so as to work in the family trucking business, and will employ him as an assistant until he is able to drive a truck.  ECF 1734 at 18.  His older sister will connect him with prisoner reentry programs.  *Id*.  Fleming will also enroll in Project Serve, a reentry program provided by Living Classrooms Foundation.  ECF 1757 at 7.

On May 26, 2021, the Warden of USP McCreary denied Fleming's administrative request for compassionate release.  *See* ECF 1736-4.  The government does not contest that Fleming has exhausted his administrative requirements.

## II.  Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

The Motion invokes both the compassionate release statute (18 U.S.C. § 3582(c)(1)(A)(i)), and § 404 of the First Step Act.  I will outline the framework for each.

### A. Compassionate Release

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence, if "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i).  This provision is an exception to the ordinary rule of finality.  *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was enacted as part of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 Fed. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying  compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020).  As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion*

*of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis added).  So, once a defendant has exhausted his administrative remedies, he or she may petition a court directly for compassionate release.  *Jenkins*, 22 F.4th at 169;  *McCoy*, 981 F.3d at 276.  That option constitutes a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) [of 18 U.S.C.] to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam).

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.  Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.  Moreover, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169.

14

The Fourth Circuit has said that, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 Fed. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).   In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release.  *See McCoy,* 981 F.3d at 276-77.[7]

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G.  § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category."  *McCoy*, 981 F.3d at 276.

---

[7] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C).  *See McCoy,* 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act. *McCoy*, 981 F.3d at 276. Of significance here, it is only "directed at BOP requests for sentence reductions." *Id.* (citing U.S.S.G. § 1B1.13). "By its plain terms, in short, § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *Id.* at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020). In other words, the policy statement does not apply to the court.

Indeed, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283. Consequently, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'" *Id.* at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 22 F.4th at 170. But, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, ___ F. App'x ___, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *United States v. Harris*, ___ F. App'x ___, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam); 28 U.S.C. § 994(t). However, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons. *Harris*, 2022 WL 636627, at *1.

Nonetheless, as the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See, e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at

*3 (W.D. Va. Apr. 2, 2020).   And, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court must consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.   *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021); *see also United States v. Butts*, No. 21-6380, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 Fed. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors); *United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021) (court must consider the § 3553(a) factors).

The Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169.   However, of relevance here, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction."   *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.   As mentioned, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for release'" raised by a defendant.   *McCoy*, 981 F.3d at 284 (citation omitted); *see Jenkins*, 22 F.4th at 169.

Nevertheless, compassionate release is a "rare" remedy. *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020). And, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018) (passim); *High*, 997 F.3d at 187. But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted).

### B. The Fair Sentencing Act of 2010 and The First Step Act of 2018

### 1.

Section 3582(c)(1)(B) provides: "The court may not modify a term of imprisonment once it has been imposed except that – (1) in any case – ... (B) the court may modify an imposed term of imprisonment to the extent otherwise expressly permitted by statute...." And, modification is permitted for a defendant who was "sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission. . . ." 18 U.S.C. § 3582(c)(2); *see United States v. Collington*, 995 F.3d 347, 353 (4th Cir. 2021) (noting that "§ 3582(c)(2) permits defendants to move for a reduced sentence based on retroactive amendments to the Guidelines"); *United States v. Smalls*, 720 F.3d 193, 195-96 (4th Cir. 2013).[8]

---

[8] "[A] sentence modification is not a plenary resentencing proceeding." *Martin*, 916 F.3d at 396 (internal quotation marks omitted).

As mentioned, in December 2018 Congress enacted the First Step Act. *See McCoy*, 981 F.3d at 276.  Section 404 of the 2018 FSA, 132 Stat. at 1522, 21 U.S.C. § 841 note, expressly "makes retroactive certain provisions of the Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372 (2010)." *Jackson*, 952 F.3d at 495; *see United States v. Lancaster*, 997 F.3d 171, 173 (4th Cir. 2021); *Collington*, 995 F.3d at 352; *United States v. Woodson*, 962 F.3d 812, 813 (4th Cir. 2020); *Chambers*, 956 F.3d at 669-70; *United States v. Gravatt*, 953 F.3d 258, 260 (4th Cir. 2020); *United States v. Wirsing*, 943 F.3d 175, 177-180 (4th Cir. 2019); *United States v. Venable*, 943 F.3d 187, 188-89 (4th Cir. 2019).  In particular, the 2018 FSA authorizes the modification of a previously imposed sentence for a defendant affected by the statutory changes to the penalty ranges for crack cocaine offenses.  *See*, *e.g.*, *Jackson*, 952 F.3d at 495.

The Fair Sentencing Act of 2010 ("2010 FSA"), which took effect on August 3, 2010, "reduced the statutory penalties for cocaine base offenses" in order to "alleviate the severe sentencing disparity between crack and powder cocaine."  *United States v. Peters*, 843 F.3d 572, 575 (4th Cir. 2016); *see Dorsey v. United States*, 567 U.S. 260, 264 (2012); *Collington*, 995 F.3d at 351 (noting that "the Fair Sentencing Act reduced sentencing disparities between cocaine and crack cocaine offenses, which were widely criticized for producing racially disproportionate sentencing outcomes"); *Wirsing*, 943 F.3d at 177–78. Of relevance here, Congress increased the threshold quantities needed to trigger mandatory sentencing ranges associated with crack cocaine offenses. *See Dorsey*, 567 U.S. at 269; *Woodson*, 962 F.3d at 812; *Gravatt*, 953 F.3d at 260.  In particular, the crack-to-powder cocaine disparity was reduced from 100-to-1 to 18-to-1. *Dorsey*, 567 U.S. at 269; *Gravatt*, 953 F.3d at 260; *United States v. Black*, 737 F.3d 280, 282 (4th Cir. 2013), *cert. denied*, 572 U.S. 1071 (2014).

Under Section 2 of the 2010 FSA, the sentencing range for possession with intent to distribute less than 28 grams of cocaine base carries a maximum of 20 years imprisonment; the sentencing range for possession with the intent to distribute more than 28 grams but less than 280 grams of cocaine base is five years to 40 years of imprisonment; and the sentencing range for possession with intent to distribute more than 280 grams of cocaine base is ten years to life imprisonment. Section 3 of the 2010 FSA, which is not at issue here, eliminated the mandatory minimum sentence for simple possession.

Thereafter, the Sentencing Commission amended the Guidelines to conform to the 2010 FSA. *Gravatt*, 953 F.3d at 260. However, the 2010 FSA did "not apply its changes retroactively," so as to "alter statutory minimum terms of imprisonment" that were previously in effect. *Id.* With the enactment in 2018 of the First Step Act, Congress rectified the inequity. *Id.*

Section 404(b) of the 2018 FSA "renders these reforms retroactive by authorizing a district court 'that imposed a sentence for a covered offense' to 'impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 were in effect at the time the covered offense was committed.'" *Woodson*, 962 F.3d at 813; *see Lancaster*, 997 F.3d at 173. In other words, under § 404 of the Act, the provisions of the 2010 FSA apply retroactively to defendants who were sentenced prior to August 3, 2010, *i.e.*, the effective date of the 2010 FSA. *United States v. Charles*, 932 F.3d 153, 162 (4th Cir. 2019).

Section 404 of the 2018 FSA, 132 Stat. at 1522, 21 U.S.C. § 841 note, provides:

**SEC. 404. Application of Fair Sentencing Act.**

(a) Definition of covered offense.—In this section, the term "covered offense" means a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010 (Public Law 111–220; 124 Stat. 2372), that was committed before August 3, 2010.

(b) Defendants previously sentenced.—A court that imposed a sentence for a covered offense may, on motion of the defendant, the Director of the Bureau of Prisons, the attorney for the Government, or the court, impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 (Public Law 111–220; 124 Stat. 2372) were in effect at the time the covered offense was committed.

(c) Limitations.—No court shall entertain a motion made under this section to reduce a sentence if the sentence was previously imposed or previously reduced in accordance with the amendments made by sections 2 and 3 of the Fair Sentencing Act of 2010 (Public Law 111–220; 124 Stat. 2372) or if a previous motion made under this section to reduce the sentence was, after the date of enactment of this Act, denied after a complete review of the motion on the merits. Nothing in this section shall be construed to require a court to reduce any sentence pursuant to this section.

The procedural framework that applies to motions under § 404 is found in 18 U.S.C. § 3582(c)(1)(B).  *See Collington*, 995 F.3d at 353 ("We have held that section 404 motions are brought under § 3582(c)(1)(B)); *Wirsing*, 943 F.3d at 183 (concluding that § 3582(c)(1)(B) is "the appropriate vehicle" for a 2018 FSA motion).  Thus, an eligible defendant may seek to reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1)(B).

 Notably, § 404 "permits the district court to *impose* a sentence on defendants under the retroactively applicable Fair Sentencing Act reforms." *Collington*, 995 F.3d at 354 (emphasis in original). The Fourth Circuit has explained that the use of the word "impose," rather than the word "modify" or "reduce," is significant; it grants district courts "greater sentencing authority to determine whether and how to reform individual sentences." *Id.* (comparing the authority given to a district judge under § 404(b) to that given under § 3582(c)). "Ultimately, the First Step Act contemplates a robust resentencing analysis…." *Id.* at 358.

Of relevance here, "when a court exercises discretion to reduce a sentence, the imposition of the reduced sentence must be procedurally and substantively reasonable." *Collington*, 995 F.3d at 358.  Procedural reasonableness does not "require the district court to hold a resentencing

hearing." *Id.* at 360. But, it requires "courts to consider a defendant's arguments, give individual consideration to the defendant's characteristics in light of the § 3553(a) factors, [and] determine— following the Fair Sentencing Act—whether a given sentence remains appropriate in light of those facts, and adequately explain that decision." *Id.*

The Fourth Circuit has made clear that, in the context of § 404 of the First Step Act, a district judge must "accurately recalculate the Guidelines sentence range"; "*correct* original Guidelines errors and apply intervening case law made retroactive to the original sentence"; and "consider the § 3553(a) factors to determine what sentence is appropriate." *Id.* at 355 (emphasis in original). And, the sentencing factors in 18 U.S.C. § 3553(a) may be used to "*depart downward* from the new Guidelines range." *Id.* (emphasis in original). Moreover, the Fourth Circuit has said that a district court will abuse its discretion "when it 'impose[s] a reduced sentence' that exceeds the maximum established by the Fair Sentencing Act." *Id.* at 356 (quoting § 404(b)) (alterations in *Collington*).

In sum, "the First Step Act tasks district courts with making a holistic resentencing determination as to whether the original sentence remains appropriate in light of the Fair Sentencing Act's reforms." *Id.* at 355.

In *Lancaster*, 997 F.3d 171, the Fourth Circuit further clarified how a district court should proceed when presented with a motion to reduce a sentence under § 404 of the First Step Act. First, the court must determine whether the sentence is "'eligible' for consideration 'on the merits.'" *Id.* at 174 (quoting *Gravatt*, 953 F.3d at 262). The sentence will be eligible for consideration if it is for a "covered offense"; the motion is addressed to the court that imposed the subject sentence; and the sentence has not "been 'previously imposed or previously reduced' under the Fair Sentencing Act." *Id.* at 174-75. Upon "determining that a sentence qualifies for review on the

22

merits, the court is then given discretion to impose a reduced sentence as if the Fair Sentencing Act were in effect at the time the covered offense was committed." *Id.* at 175. To make that determination, "the court must engage in a brief analysis that involves the recalculation of the Sentencing Guidelines in light of 'intervening case law'…and a brief reconsideration of the factors set forth in 18 U.S.C. § 3553(a)." *Id.* (citing *Collington*, 995 F.3d at 355; *Chambers*, 956 F.3d at 672).

**2.**

As indicated, if the sentence qualifies for review on the merits, the court must consider "intervening case law" and the factors under 18 U.S.C. § 3553(a).  *Collington*, 995 F.3d at 355; *Chambers*, 956 F.3d at 672.  Of relevance here, Section 401 of the First Step Act of 2018 modified 21 U.S.C. § 851 in two ways. Titled "Reduce and Restrict Enhanced Sentence for Prior Drug Felonies," it reduced the mandatory minimum penalties and narrowed the scope of its application.

Prior to the passage of the First Step Act, a "felony drug offense," defined as an offense that is punishable by a term of imprisonment of more than one year, qualified as a § 851 predicate offense.[9]  But, under the amended version of § 851, only a "serious drug felony" or "serious violent felony" qualifies as a predicate offense. *See* 21 U.S.C. § 851 (as amended by § 401(a) of the 2018 FSA); *see also* 21 U.S.C. §§ 802(57)(A) and (58)(A) (defining "serious drug felony" and "serious violent felony," respectively).

---

[9] A felony drug offense is one that "is punishable by imprisonment for more than one year under any law of the United States or of a State or foreign country that prohibits or restricts conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances." 21 U.S.C. § 802(44).

A "serious drug felony" is defined in 21 U.S.C. § 802(57), with reference to offenses described in 18 U.S.C. § 924(e)(2) (the Armed Career Criminal Act).  Section 802(57) defines a "serious drug felony" as:

> An offense prohibited by § 924(e)(2) of Title 18 for which –
>
> (A) The offender served a term of imprisonment of more than 12 months; and
>
> (B) The offender's release from any term of imprisonment was within 15 years of the commencement of the instant offense.

Section 924(e)(2) of 18 U.S.C. defines "serious drug felony" as an offense, *inter alia*, involving manufacturing, distributing, or possessing with intent to distribute a controlled substance, with a maximum term of imprisonment of ten years or more.

In addition, the 2018 FSA reduced the mandatory minimum penalties triggered by a § 851 notice, applicable to offenders with one or more prior predicate offenses. *See* First Step Act § 401(a)(2). Specifically, for offenses involving more than 280 grams of cocaine base, the First Step Act reduced the mandatory minimum penalty from 20 years to 15 years for individuals with one prior qualifying conviction and from life to 25 years for individuals with two or more prior qualifying convictions.  *See* 21 U.S.C. § 841(b)(1).

Section 401(c) clarified that these statutory changes apply to conduct that occurred before the First Step Act's enactment, *i.e.*, prior to December 21, 2018, "if a sentence for the offense has not been imposed as of" that date.

### III.  COVID-19[10]

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[11]  Defendant filed his motion for compassionate release in November 2020.  ECF 1658.  At that time, the nation was "in the grip of a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases).  Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of it.  *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").  Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 Fed. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19*

---

[10] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[11] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

*Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. The judiciary, too, faced many operational challenges.

People who are stricken with the virus sometimes experience only mild or moderate symptoms.  But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted). As of March 10, 2022, COVID-19 has infected more than 79 million Americans and caused approximately 964,000 deaths in this country.  *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed Mar. 10, 2022).

For a brief time, this country enjoyed a reduction of COVID-19 cases.  In the fall of 2021, the trend seemed favorable.  *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021,  https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html  ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region.").  But, the trend was short-lived, due to the spread of the Delta variant. *See* Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html. (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").  Indeed, the Delta variant was thought to be more virulent and capable of causing more severe illness than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants");  *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021,

https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show.").

Then, the Omicron variant emerged, both around the world and in the United States, which sparked further cause for concern.  It too, is highly contagious.  *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021).  Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases.  *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html. More recently, the number of COVID-19 cases has again declined.  *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records*., WASH. POST (Feb. 7, 2022), https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y.

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus.  Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system.  *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

The CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.  Most recently in December 2021, it again updated its

guidance to reflect the most available data.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Dec. 14, 2021), https://bit.ly/38S4NfY.   According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis.  *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.  Furthermore, "[t]he risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person."  *People with Certain Medical Conditions*, *supra*.

To stem the spread of the virus, people have been urged to practice "social distancing" and to wear masks.  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020).  However, social distancing is particularly difficult in the penal setting.  *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area.").

Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons,

the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."[12]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an

---

[12] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

"extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

On May 8, 2020, two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum to implement the Attorney General's directives on the increased use of home confinement. The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

Although there is currently no cure for the virus, medical treatments have continued to improve. And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer,

31

Moderna, and Johnson & Johnson).[13] Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since been approved for all persons five years of age and older.  *See* Cheyenne Haslett, *FDA Authorizes COVID-19 Vaccine for Kids 5-11*, ABC NEWS, Oct. 29, 2021, https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188. Approximately 65% of the total U.S. population is fully vaccinated, including 27% of people from ages 5 to 11, 58% of people from ages 12 to 17, 72% of people from ages 18 to 64, and 89% of people age 65 and up.  *See How Vaccinations Are Going in Your County and State*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited Mar. 10, 2022).  Moreover, roughly 96 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 18 and older.  *See id*.; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated Dec. 20, 2021).

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

---

[13] Questions as to the efficacy of the Johnson & Johnson vaccine were raised as to the Delta and Omicron variants. *See J&J, Sinopharm, Sputnik V COVID-19 shots less effective against Omicron -study*, REUTERS (Dec. 17, 2021), https://www.reuters.com/business/healthcare-pharmaceuticals/jj-sinopharm-sputnik-v-shots-weaker-against-omicron-study-shows-2021-12-17/; Apoorva Mandavilli, *J.&J. Vaccine May Be Less Effective Against Delta, Study Suggests*, N.Y. TIMES (July 20, 2021), https://www.nytimes.com/2021/07/20/health/coronavirus-johnson-vaccine-delta.html.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/  federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of March 10, 2022, the BOP had 134,396 federal inmates and 36,000 staff.  And, by that date, the BOP had administered 305,262 vaccine doses to staff and inmates.  *See* https://www.bop.gov/coronavirus/ (last accessed Mar. 10, 2022).

As of March 10, 2022, the BOP reported that 291 federal inmates, out of a total population of 134,396, and 423 BOP staff, out of some 36,000 staff members, currently test positive for COVID-19.  Moreover, 54,324 inmates and 12,210 staff have recovered from the virus.  And, 288 inmates and seven staff members have died from the virus.  The BOP has completed 128,872 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to USP McCreary, where the defendant is imprisoned, the BOP reported that as of March 10, 2022, out of a total of 1,524 inmates, one inmate has tested positive, two inmates have died of COVID-19, and 287 inmates and 145 staff have recovered at the facility. In addition, 199 staff members and 1,335 inmates at the USP McCreary complex have been inoculated with the vaccine.  *See*  https://www.bop.gov/coronavirus/,  Federal  Bureau  of  Prisons, https://www.bop.gov/locations/institutions/mcr/ (last visited Mar. 10, 2022).

### IV.  Discussion

Fleming argues that his medical reasons, as well as the severity of his sentence and his relative youth at the time of the offense, create extraordinary and compelling circumstances justifying immediate compassionate release.  ECF 1734 at 5-16.  He also argues that he is eligible for a reduced sentence under § 404.  *Id*. at 14-16.  And, he contends that the § 3553(a) sentencing

factors justify a reduction of his sentence from life imprisonment to time served, which dates to 2007.  The government opposes any reduction in Fleming's sentence.  In the alternative, it proposes a reduction to 27 years of imprisonment.  ECF 1752 at 22-23.

## A. Extraordinary and Compelling Analysis

In support of defendant's request for compassionate release, he points to his medical conditions.  In particular, Fleming cites his Type II diabetes and his severe obesity.  *See* ECF 1734 at 5-7.

Fleming's medical records from April 13, 2021, reflect an assessment of Type II diabetes, an elevated blood glucose level, and a prescription for twice-daily Metformin to manage his diabetes.  ECF 1736-5 at 13.  The records also indicate that defendant is severely obese.

The CDC defines "overweight" as a Body Mass Index ("BMI") of between 25 and 30; "obese" as a BMI of between 30 and 40; and "severely obese" as a BMI of 40 or greater.  *Id.*   As to his obesity, Fleming's medical records as of September 2, 2020, reflect a BMI of 32.5.  *Id.* at 21.  And, more recent records from April 13, 2021, indicate a weight of 297 pounds.  ECF 1736-5 at 13.  Based on a height of 71 inches, or 5'11", gleaned from Fleming's medical records, defendant's briefing asserts a current BMI of 41.4. *See* ECF 1734 at 6 n.3;[14]  *see also Adult BMI Calculator*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (last visited Jan. 28, 2022).

The CDC lists both obesity and diabetes as conditions that increase the likelihood of severe illness from COVID-19.  *See People with Certain Medical Conditions*, *supra*.  According to the CDC: "Having either type 1 or type 2 diabetes can make you more likely to get severely ill from

---

[14] Per the PSR, Fleming is 5'10."  ECF 1736-3, ¶ 89.  If so, his BMI is 42.6.

34

COVID-19." *Id.* As to obesity, the CDC has said that being overweight, obese, or severely obese can likewise increase the chance of severe illness, with the risk "increase[ing] sharply with elevated BMI." *Id.*

Numerous courts have found that, in light of the COVID-19 pandemic, serious chronic medical conditions, including obesity and diabetes, qualify as compelling reasons for compassionate release. *See, e.g.*, *United States v. Smith*, 538 F. Supp. 3d 990 (E.D. Cal. 2021) ("Many courts have also found that people who have a body mass index within the ranges defined as 'overweight' or 'obese' are at greater risk of severe COVID-19."); *United States v. Staten*, PJM-01-284-4, 2020 WL 4904270, at *2 (D. Md. Aug. 18, 2020) (finding an "extraordinary and compelling reason" for compassionate release based on a BMI of 38); *United States v. Williams*, PWG-19-134, 2020 WL 3073320 (D. Md. June 10, 2020) (finding obese defendant with a BMI of 32.5 qualified for compassionate release in light of COVID-19); *United States v. Quintero*, 08-CR-6007L, 2020 WL 2175171, at *1 (W.D.N.Y. May 6, 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension satisfied an extraordinary and compelling reason); *United States v. Dawson*, No. 18-40085, 2020 WL 1812270, at *7 (D. Kan. Apr. 9, 2020) (granting compassionate release based on a defendant's obesity).

The government concedes that defendant's medical conditions place him within the CDC risk categories as to COVID-19. ECF 1752 at 5. However, the government argues that a finding of extraordinary and compelling circumstances is inappropriate because conditions within BOP do not reflect a serious risk of COVID-19 exposure, and because defendant has been vaccinated. *Id.* at 5-12.

As to the safety of BOP facilities, it appears that the BOP has strived to protect prisoners from COVID-19. But, as discussed above, conditions inherent to penal institutions make it

difficult to protect against COVID-19, which is highly contagious.  And, BOP records reflect that two inmates have died of COVID-19 at USP McCreary, one of whom apparently passed away since the government filed its Opposition in August 2021.  *See* https://www.bop.gov/coronavirus/, Federal Bureau of Prisons (last visited Feb. 4, 2022); *see also* ECF 1752 at 6.

Nor am I persuaded by the government's argument as to vaccination.  The COVID-19 vaccines help to reduce the health risks posed by the coronavirus.  But, the fact of vaccination does not defeat every underlying health condition that might otherwise render an individual eligible for compassionate release.  *See United States v. Palmer*, PWG-13-623, 2021 WL 3212586, at *3 (D. Md. July 29, 2021) ("It is impossible to predict the impact of the vaccines on future strains of the virus, just as it is impossible to predict the impact of COVID-19 on [defendant's] specific medical issues."); *Spriggs*, 2021 WL 1856667, at *3 (inmate's receipt of vaccine "does not negate that his underlying health conditions make him eligible for compassionate release.").

Indeed, the media, as well as the CDC, are filled with reports of breakthrough infections of COVID-19 among vaccinated individuals.   Breakthrough infections appear to be particularly common with the highly contagious Omicron variant, although vaccination seems effective at preventing serious illness.  *See, e.g.*, *Omicron Variant: What You Need to Know*, Ctrs. for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 20, 2021).  In any event, however rare, breakthrough cases can result in death. *See Rates of COVID-19 Cases and Death by Vaccination Status*, Ctrs. for Disease Control, https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status (last updated Nov. 20, 2021).

Several judges of this Court have concluded that an inmate is eligible for compassionate release, notwithstanding vaccinated status.  *See, e.g*., *United States v. Jenkins*, DKC-12-0043, 2021 WL 5140198, at **4-5 (D. Md. Nov. 4, 2021) (granting compassionate release to a defendant based

on his obesity and chronic kidney disease, in spite of the fact that he was fully vaccinated against COVID-19); *United States v. Garcia*, CCB-11-569, 2021 WL 4846937, at *2 (D. Md. Oct. 15, 2021) (finding that a vaccinated defendant's diabetes and hypertension constituted extraordinary and compelling circumstances); *United States v. Hussain*, PWG-13-661, 2021 WL 3367822, at *4 (D. Md. Aug. 3, 2021) (explaining that a fully vaccinated defendant with a history of smoking as well as a number of underlying conditions, including moderate asthma and hypertension, presented an extraordinary and compelling reason for his release).

Given defendant's uncontested health conditions, I am satisfied that he has made a showing of extraordinary and compelling circumstances under the compassionate release statute.

### B. First Step Act Analysis

Fleming has also moved for relief under § 404 of the First Step Act.  As noted, § 404 of the 2018 FSA makes the provisions of the 2010 FSA available to a defendant who was sentenced before August 3, 2010, for a "covered offense."  Section 404(a) defines a "covered offense" as "a violation of a Federal criminal statute, the statutory penalties for which were modified by Section 2 or 3" of the 2010 FSA, which reduced the statutory penalties for cocaine base offenses. *See Peters*, 843 F.3d at 575 (stating that the 2010 FSA "reduced the statutory penalties for cocaine base offenses").

Fleming's crack cocaine conviction, in violation of 21 U.S.C. § 841(b)(1)(A), as well as his crack cocaine drug conspiracy conviction, in violation of 21 U.S.C. § 846, are clearly covered offenses under § 404 of the 2018 FSA. *See Lancaster*, 997 F.3d at 174 (concluding that a "covered offense" includes violations under 21 U.S.C. §§ 841(b)(1)(A)(iii), (b)(1)(B)(iii), and (b)(1)(C)); *Woodson*, 962 F.3d at 813, 817 (concluding that when 2010 FSA changed the quantities of crack cocaine to which § 841(b)(1)(C) applies, it modified the statutory penalties of that subsection, and

the change constitutes a "covered offense"); *Gravatt*, 953 F.3d at 262 (discussing the "threshold requirement of a 'covered offense' "); *Peters*, 843 F.3d at 575 (stating that the 2010 FSA "reduced the statutory penalties for cocaine base offenses").

Moreover, Fleming was sentenced prior to August 3, 2010.  And, he has directed his motion for a reduction to the court that originally sentenced him, and this is his first such motion. *Lancaster*, 997 F.3d at 174-75.

Therefore, Fleming is eligible for relief under the 2018 FSA.  *See Gravatt*, 953 F.3d at 258 (concluding that so long as there is one covered offense, the court may resentence).  Indeed, the government does not argue that Fleming is *not* eligible under § 404.  *See* ECF 1752 at 16 ("Assuming the defendant is eligible for a Section 404 reduction, the Court should not exercise its discretion to do so in this case.").

That determination hardly ends the inquiry, however.  "In imposing a new sentence, the Court is not limited to a mathematical recalculation based on the changed mandatory minimum sentences established by FSA 2010." *United States v. Nicholson*, TDC-03-0268, ECF No. 394 at 7-8 (D. Md. May 21, 2021) (citing *Collington*, 995 F.3d 347). Rather, as noted, the Court must determine whether a sentence reduction is warranted in light of intervening changes in the case law and it must consider the factors set forth in 18 U.S.C. § 3553(a). *Lancaster*, 997 F.3d at 175. And, § 404 does not limit what a court may consider in connection with a resentencing authorized by the statute. "Thus, just as there is under § 404 'no limiting language to preclude the court from applying intervening case law,'…there is no limiting language to preclude the application of intervening legislative changes from which Defendant can benefit." *United States v. Day*, 474 F. Supp. 3d 790, 800 (E.D. Va. 2020) (quoting *Chambers*, 956 F.3d at 672).

Pursuant to Fourth Circuit precedent, discussed below, it is clear that if the Court imposes a new sentence pursuant to § 404, then it should apply present day sentencing law, and this would include the effect of § 401 on a sentencing enhancement under 21 U.S.C. § 851, even though § 401 is not retroactive. *See Collington*, 995 F.3d 347; *Chambers*, 956 F.3d at 672; *see also Lancaster*, 997 F.3d at 176-77 (Wilkinson, J., concurring) (noting that the Fourth Circuit's rulings "require the application of non-retroactive Guidelines errors in First Step Act resentencings").[15]

In *Lancaster*, 997 F.3d 171, the Fourth Circuit considered what a district court is required to analyze "on the merits" of a motion for a sentence reduction when a defendant is eligible for discretionary relief under the First Step Act. There, the defendant was sentenced for conspiracy to traffic in crack cocaine and cocaine powder, in violation of 21 U.S.C. § 846. *Id.* at 175. The defendant also qualified as a career offender under U.S.S.G. § 4B1.1 and was sentenced on that basis.

The district court found that the defendant was eligible for discretionary relief under § 404, because his sentence was subject to modification under the 2010 FSA. But, the district court "did not recalculate the defendant's Guidelines sentencing range in light of 'intervening case law.'" *Id.* at 176 (quoting *Chambers*, 956 F.3d at 672). Instead, it found that it would have imposed the same sentence, even if the Fair Sentencing Act had been in effect at the time of the original sentencing.

On appeal, the defendant argued that if the district court had recalculated his Guidelines range in light of intervening case law he would have received a reduced sentence because he no longer qualified as a career offender, in light of the Fourth Circuit's decision in *United States v.*

---

[15] As discussed, *infra*, in deciding whether to grant compassionate release, the Court is also entitled to consider changes in the law that have occurred since the original sentencing. *See, e.g.*, *McCoy*, 981 F.3d at 285-86; *United States v. Johnson*, RDB-07-0153, ECF No. 183 at 10-11 (D. Md. Oct. 14, 2020); *United States v. Stockton*, ELH-99-352, 2021 WL 1060347, at *14 (D. Md. Mar. 17, 2021).

*Norman*, 935 F.3d 232 (4th Cir. 2019).  The Fourth Circuit agreed, finding "that additional analysis was required" before the district court could decline to reduce defendant's sentence.  *Lancaster*, 997 F.3d at 172. The *Lancaster* Court explained that "to determine whether a sentence under the Fair Sentencing Act would be the same as the sentence previously imposed…the court would at least have to" recalculate the defendant's Guidelines range on the basis of the changes to the career offender enhancement and consider the § 3553(a) factors to "determine whether its balancing of the factors was still appropriate in light of intervening circumstances." *Id*. at 175.

Judges in this District have concluded that, in considering a sentence reduction under § 404, the court should not apply the enhanced mandatory minimum penalties pursuant to § 851 notices that were based on prior convictions that no longer qualify as predicate convictions under the 2018 FSA. For example, in *Nicholson*, TDC-03-0268, ECF 394 at *8-9, the court concluded that "the mandatory life sentence[] pursuant to the § 851 enhancement would not apply under present law and thus should not be applied when the Court imposes a new sentence" under § 404. *See also United States v. Wilson*, RDB-03-0309, 2021 WL 1312904, at *3-4 (D. Md. Apr. 7, 2021).

*United States v. Sappleton*, PJM-01-284-3, 2021 WL 598232 (D. Md. Feb. 16, 2021), is also instructive. Sappleton was convicted of conspiracy to distribute 50 grams or more of crack cocaine and five kilograms or more of powder cocaine and received a mandatory sentence of life imprisonment as a result of the government's notice of enhanced penalties under § 851. *Id.* at *1. In considering a motion under 18 U.S.C. § 3582(c)(1)(A) and § 404 of the First Step Act, Judge Messitte found that courts can, and "indeed should," apply the current version of § 851 in imposing a new sentence. *Id.* at *4. Judge Messitte reasoned that "it would be inconsistent with the remedial purpose of the First Step Act to apply statutory penalties that Congress has since reduced and restricted by narrowing the types of convictions that trigger enhanced penalties." 2021 WL

598232, at *4 (citing *United States v. Boulding*, 960 F.3d 774, 784 (6th Cir. 2020) (holding that a "[§ 404] resentencing predicated on an erroneous or expired guideline calculation would seemingly run afoul of Congressional exceptions."). Thus, he granted defendant's motion under § 404. *Sappleton*, 2021 WL 598232, at *5.

Indeed, § 404(b) expressly permits the court to "impose a reduced sentence." And, as mentioned, the Fourth Circuit has emphasized that the use of the word "impose" signifies that a court should "not simply adjust the statutory minimum; it must also recalculate the Guidelines range." *Chambers*, 956 F.3d at 673.  In other words, pursuant to § 404, the court imposes a new sentence based on the penalties that apply at the time of resentencing, including any reduced penalties enacted as part of the 2018 FSA. *See Sappleton*, 2021 WL 598232, at *3 ("Applying defunct statutory penalties would also be inconsistent with the text of section 404(b), which 'expressly permits the court to 'impose a reduced sentence'—not to 'modify' or 'reduce,' which might suggest a mechanical application of the Fair Sentencing Act, but 'impose.'" (quoting *Chambers*, 956 F.3d at 672)); *see also United States v. Boulding*, 960 F.3d 774, 784 (6th Cir. 2020) (stating that a § 404 "resentencing predicated on an erroneous or expired guideline calculation would seemingly run afoul of Congressional expectations."); *Day*, 474 F. Supp. 3d at 801 (noting that "the use of the word 'impose' signifies that § 404 is not predicated on a pre-existing sentence that is simply modified; rather, the word 'impose' contemplates a sentencing process that begins essentially *ab initio*, without any carry-over effect from the original sentence and with the full range of considerations typically at play during a sentencing, including the law in effect at the time of the sentencing and the sentencing factors under 18 U.S.C. § 3553(a).").

Therefore, in considering a sentence for Fleming, it is appropriate to apply the current version of § 851, as amended by § 401 of the 2018 FSA.  This is in accordance with the text and

purpose of the 2010 Fair Sentencing Act and the 2018 First Step Act, as well as guidance from the Fourth Circuit.[16]  However, as discussed, *infra*, because the murder cross reference still applies, there is no change to defendant's Guidelines.  As a result, defendant's offense level remains a 45, with a Guidelines range of life imprisonment.

### C. Sentencing Analysis

Having found extraordinary and compelling circumstances under 18 U.S.C. § 3581(c)(1)(A), and having found defendant to be eligible for relief under § 404 of the 2018 FSA, the Court must now consider Fleming's appropriate sentence.  As discussed, in imposing a new sentence under § 404 of the 2018 FSA, the Court must consider the sentencing factors under 18 U.S.C. § 3553(a) and intervening changes in sentencing law.  *See, e.g.*, *Lancaster*, 997 F.3d at 175; *Collington*, 995 F.3d at 355; *Chambers*, 956 F.3d at 672.  Likewise, under § 3582(c)(1)(A), the compassionate release statute, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) in deciding whether and how to exercise its sentencing discretion.  *See, e.g.*, *High*, 997 F.3d at 186.

The § 3553(a) sentencing factors include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.  *High*, 997 F.3d at 186.

---

[16] Courts have also found that the sentencing disparity resulting from changes to § 851's penalty structure can constitute an extraordinary and compelling reason to grant relief under the compassionate relief statute. *See, e.g.*, *Nicholson*, TDC-03-0268, ECF No. 394; *Sappleton*, 2021 WL 598232, at *3; *United States v. Williams*, 5:12-cr-14, 2020 WL 5834673, at *8 (W.D. Va. Sept. 30, 2020).

In addition, as part of the § 3553(a) analysis, many judges in this District have considered a change in the sentencing law landscape that a defendant would face if prosecuted today for the same offense.  As Judge Bennett has explained: "[C]hanges in the sentencing law landscape are relevant to the Court's analysis of whether the Court's sentence appropriately addresses 'the need for a sentence to provide just punishment, promote respect for the law, reflect the seriousness of the offense, deter crime, and protect the public."  *United States v. Johnson*, RDB-07-0153, ECF No. 183 at 10-11 (D. Md. Oct. 14, 2020).  *See also, e.g., McCoy*, 981 F.3d at 285-86; *United States v. Stockton*, ELH-99-352, 2021 WL 1060347, at *14 (D. Md. Mar. 17, 2021); *United States v. Chandler*, GLR-05-0181, ECF 119 at 1-2 (D. Md. May 14, 2020); *United States v. Laurey*, JKB-06-0586, ECF 81 at 1, 3 (D. Md. Feb. 19, 2020); *United States v. Wesley*, JKB-10-0118, ECF 73 at 1 (D. Md. Feb. 18, 2020); *United States v. Smith*, DKC-98-0252, ECF 92 at 4 (D. Md. Feb. 14, 2020); *United States v. Watts*, PJM-06-036, ECF 114 at 7 (D. Md. Feb. 6, 2020); *United States v. Thompson*, CCB-09-0128, ECF 123 at 2 (D. Md. Jan. 16, 2020).  This means that the changes implemented by § 404 may also be a factor in the compassionate release analysis, in addition to constituting independent grounds to modify a defendant's sentence.

Consideration of intervening changes in the law raises the question of the effect of the First Step Act's § 851 changes.  I have already explained why I may consider this issue in the § 404 context.  As discussed, at sentencing, the defendant was subject to a 20-year mandatory minimum sentence on the basis of his 2004 felony drug conviction.  Fleming briefly notes, *see* ECF 1734 at 4 n.2, that if sentenced today, the enhanced mandatory minimum for his "prior felony drug conviction" would be ten years rather than 20 years, because Fleming would fall under 21 U.S.C. § 841(b)(1)(B)(iii), rather than § 841(b)(1)(A)(iii).

If Fleming's prior conviction is still a qualifying offense, he would now face a mandatory minimum sentence of ten years' imprisonment for both Count Two and Count Four. But, in my view, it is not clear that the 2004 conviction is a proper predicate. Notably, this issue is not raised by Fleming or addressed by either side in the briefing.

As discussed, the First Step Act altered the definition of a qualifying § 851 predicate offense from a felony drug offense to a "serious drug felony" or "serious violent felony." A "serious drug felony" is one for which the offender served a term of imprisonment of more than 12 months; for which the offender's release from any term of imprisonment was within 15 years of the commencement of the instant offense; and which is defined as a "serious drug felony" under 18 U.S.C. § 924(e)(2). *See* 21 U.S.C. § 802(57)(A). In turn, 18 U.S.C. § 924(e)(2) defines "serious drug felony" as an offense, *inter alia*, involving manufacturing, distributing, or possessing with intent to distribute a controlled substance, with a maximum term of imprisonment of ten years or more.

Fleming's sole qualifying offense was his 2004 conviction for possession with intent to distribute narcotics. *See* ECF 1736-3, ¶ 60. And, under Maryland law, possession with intent to distribute a narcotic drug carries a maximum term of imprisonment of 20 years. *See* Md. Code (2021 Repl. Vol.), §§ 5-602 and 5-608 of the Criminal Law Article ("C.L.").[17] Furthermore, this offense was within a few years of the instant offense.

However, Fleming was sentenced to two years of incarceration, all of which was *suspended*, as well as 18 months' probation. ECF 1736-3, ¶ 60. He appeared in court on August

---

[17] Possession with intent to distribute, outside the context of a Schedule I or Schedule II narcotic drug, carries only a five-year maximum sentence. C.L. § 5-607(a). But, the 2004 offense appears to have been for narcotics. *See* ECF 1736-3, ¶ 60.

19, 2005, for a violation of probation, with no plea and no verdict. *Id.* Probation was terminated as unsatisfactory, and he was "given credit for time served (9/14/2004-8/19/2005)." *Id.*

Thus, although the records available to the Court are not clear, and the briefing does not illuminate this issue, it would appear that Fleming served, at most, 11 months in prison, which is short of the requirement in 21 U.S.C. § 802(57)(A) that the offender must have "served a term of imprisonment of more than 12 months." *See, e.g.*, *United States v. Fletcher*, TDC-05-0179, 2020 WL 2490025, at *2 (D. Md. May 14, 2020) ("Because the definition of 'serious drug felony' includes a requirement that a defendant served more than 12 months on that conviction, and [the defendant's] only prior drug distribution conviction resulted in three-year sentence but with all but 90 days suspended, the parties agree that if [the defendant] were to be sentenced under present law, the § 851 enhancement would not apply . . . .").

If so, then Fleming has no qualifying § 851 offense at all. In that circumstance, his mandatory minimum sentence would be five years under 21 U.S.C. § 841(b)(1)(B)(iii), rather than the ten years that would apply today if there were a prior qualifying conviction, or the 20 years in effect at the time of sentencing, under 21 U.S.C. § 841(b)(1)(A)(iii).

This issue affects not only Fleming's mandatory minimum sentence, but also his statutory maximum. Today, 21 U.S.C. § 841(b)(1)(A) provides for a maximum term of life imprisonment, just as it did when Fleming was sentenced. But, if Fleming were sentenced today, it would not be pursuant to § 841(b)(1)(A), because under the 2010 FSA, the triggering quantity for § 841(b)(1)(A) was increased from 50 grams of cocaine base to 280 grams. Rather, Fleming would be sentenced under § 841(b)(1)(B), which now has a triggering quantity of 28 grams of cocaine base.

Notably, § 841(b)(1)(B) provides for a maximum term of life imprisonment, if there is a prior qualifying offense. But, if there is no prior qualifying offense, then this provision, both today

and when Fleming was sentenced, provides for a maximum prison term of 40 years, rather than life. *Id*. This applies to both Count Two and Count Four.

There is an exception, however. The exception is if "death or serious bodily injury results from the use of [the] substance," then there is a mandatory minimum term of 20 years' imprisonment and a maximum term of life imprisonment. 21 U.S.C. § 841(b)(1)(B).

Judge Quarles found that Jackson's murder was relevant and related conduct at sentencing. But, it does not appear that there has been any finding that death or serious bodily injury resulted from the *use* of any substance at issue in Counts Two and Four. No mention of this issue appears in the government's § 851 notification (ECF 907); the jury verdict (ECF 964); the government's sentencing memorandum (ECF 1035); the transcript of the sentencing hearing (ECF 1736-2); the Statement of Reasons (ECF 1066); or the PSR (ECF 1736-3). And, "[b]ecause the 'death results' enhancement increase[s] the minimum and maximum sentences to which [a defendant is] exposed, it is an element that must be submitted to the jury and found beyond a reasonable doubt." *Burrage v. United States*, 571 U.S. 204, 210 (2014).

The government argues that the § 404 issues are, essentially, a red herring, because the application of the murder cross-reference was what drove the sentence in this case. ECF 1752 at 16. This is a fair point. As noted, Judge Quarles found that it was more likely than not that Fleming killed Jackson, and that this murder was relevant and related conduct. And, this finding was backed by considerable evidence and upheld by the Fourth Circuit. *See Mouzone*, 687 F.3d at 220-21. It clearly drove the Guidelines range. Moreover, this conduct was undoubtedly a factor in Judge Quarles's decision to impose a life sentence.

As noted, the Court must recalculate the Sentencing Guidelines as part of the § 404 analysis. *Lancaster*, 997 F.3d at 175 (citing *Collington*, 995 F.3d at 355; *Chambers*, 956 F.3d at

672).  But, as stated, the murder cross-reference remains applicable to Fleming.  Therefore, the offense level of 45 remains unchanged.  And now, as then, this would yield a Guidelines range of life, based on the total offense level of 45 and a criminal history category of IV.  Both parties appear to agree that Fleming's Guidelines range remains unchanged.  ECF 1734 at 16; ECF 1752 at 16.

But, this Guidelines range of life is greater than the statutory maximum of 40 years for Counts Two and Four, which applies today under 21 U.S.C. § 841(b)(1)(B).  The sentences could be imposed consecutively, however.  *See* U.S.S.G. § 5G1.2(d) ("If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment.").

In sum, it appears likely that Fleming no longer has a qualifying § 851 prior conviction, although it is difficult to determine this precisely based on the information provided to the Court.  But, if that is so, the mandatory minimum for Count Two and Count Four is five years.  And, as noted, the statutory maximum for each count is 40 years of imprisonment, rather than life.

Fleming's criminal history is meaningful, albeit not extraordinary.  As noted, he was convicted of possession with intent to distribute narcotics; firearm possession; unlawful possession; and an open container violation.  ECF 1736-3, ¶¶ 60-62.  At the same time, he does have a history of probation violations.  The instant offense, for example, was committed while Fleming was on probation for his conviction for possession of a firearm.

Notably, Fleming was young when he committed the offenses at issue here; he was 21 years old when he was arrested.  And, he was no older than 19 years old when he committed his State crimes.  The Court may consider the defendant's youth as part of its individualized

47

assessment.  *See McCoy*, 981 F.3d at 286 (noting that "many courts have found relevant" "defendants' relative youth . . . at the time of their offenses).

Nevertheless, Fleming's offenses here were extraordinarily grave.  He participated in an extensive criminal enterprise, TTP, whose activities included drug trafficking and robbery.  The harmful effect of such an enterprise on the community in which the gang was active cannot be overstated.  Moreover, Lamont Jackson was brutally murdered, and Judge Quarles found it likely that defendant committed the murder.[18]  Crimes of this magnitude warrant serious punishment.

At the same time, Fleming's sentence of life imprisonment is far in excess of more recent sentences in this District for similar offenses.  As Judge Blake recently observed, the average federal sentence for murder has declined in recent years.  *See United States v. Bryant*, 95-202-CCB-3, 2020 WL 2085471, at *5 n.8 (D. Md. Apr. 30, 2020) ("According to statistics released by the United States Sentencing Commission for fiscal year 2018, the national average sentence for murder was 291 months, and the Fourth Circuit average was 327 months.") (citing *United States v. Redd*, 444 F. Supp. 3d 717, 728 (E.D. Va. 2020)); United States Sentencing Commission, Statistical Information Packet, Fiscal Year 2018, Fourth Circuit, available at (https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2018/4c18.pdf), *aff'd*, *McCoy*, 981 F.3d 271.  Indeed, the trend has continued since the time Bryant was decided: data from the United States Sentencing Commission reflects that in fiscal year 2020, the national average sentence for murder was 255 months, and the Fourth Circuit average was 271 months. See United States Sentencing Commission, Statistical Information Packet, Fiscal Year 2020, Fourth Circuit, available at

---

[18] As noted, the TTP was also implicated in the murder of Marquel Smith.

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2020/4c20.pdf.

In *United States v. Floyd*, CCB-16-597, Floyd was one of several defendants convicted after a 25-day trial. *See id.*, ECF 477; ECF 491.  In particular, Floyd was convicted of racketeering conspiracy that included murders and drug conspiracy.   However, he was not the shooter. Although his offense level and criminal history category called for a life sentence, Judge Blake imposed a total sentence of 360 months' imprisonment.  *Id.*, ECF 691.

More recently, in *United States v. Antoine*, PWG-19-140, the defendant was involved in a drug trafficking organization in Baltimore and confessed to the intentional shooting and killing of an individual in relation to the drug conspiracy.   *See id.*, ECF 349 at 9-10.  Pursuant to a plea agreement, Antoine entered a plea of guilty to one count of conspiracy to distribute controlled substances and one count of discharging a firearm resulting in death during and in relation to a drug trafficking crime.   *Id.*   Although Antoine was the shooter, Judge Grimm imposed a total sentence of 270 months (22.5 years).  *Id.*, ECF 465.

The case of *United States v. Blake*, ELH-06-394, is also instructive.[19]  The defendant was convicted of carjacking resulting in death; conspiracy to possess a firearm in furtherance of a crime of violence; possession of a firearm in furtherance of a crime of violence; and murder resulting from possession of a firearm in furtherance of a crime of violence.  See ELH-06-395, ECF 62 (Judgment).  In particular, a victim was murdered in the course of a carjacking in which Blake was a conspirator and participant, and which occurred when the defendant was 17 years old.  *See id.*, ECF 123 at 3; *id.*, ECF 149 at 2.  Blake was originally sentenced to life imprisonment, but his

---

[19] The case was initially assigned to Judge William Nickerson. It was reassigned to me on January 29, 2016, due to the retirement of Judge Nickerson. *See* Docket.

sentence was ultimately reduced to 30 years of imprisonment following a joint motion by the Government and the defendant to reduce Blake's sentence and resolve his § 2255 motion (*id*., ECF 123), and a subsequent joint motion for compassionate release. *Id*., ECF 165.

On the other hand, some sentences meted out by this Court in a murder case have been longer, even when the defendants pleaded guilty. In *United States v. Whisonant, et al*., ELH-17-191, for example, three of the defendants pleaded guilty to conspiracy to distribute heroin and to discharging a firearm resulting in death, during and in relation to a drug trafficking crime, or to possession of a firearm in furtherance of a drug trafficking crime. The murder was unexpectedly captured, in real time, during an authorized wiretap. One defendant received a total sentence of 360 months imprisonment, another received a sentence of 420 months, and still another received a sentence of 480 months of incarceration. *See id*.

Fleming has been incarcerated essentially since April 24, 2007—approximately 177 months, or more than forty percent of his life. During incarceration, he has accumulated a number of disturbing disciplinary infractions. That said, more recently his disciplinary record has improved, with only three incidents since 2014.

Moreover, despite his life sentence, Flemming has engaged in substantial rehabilitative efforts. He has completed over 2,500 hours of educational programs, and he has obtained his GED. *See* ELH-08-086, ECF 1658-1 at 1-2; ECF 1736-9 at 1-2, 8-9. These efforts are laudable.

And, Fleming has expressed remorse, stating to the Court in a letter of June 14, 2021 (ECF 1736-6 at 3): "To this day I regret [becoming a Blood], for the last 8 years I get on my knees and pray to God for forgiveness." More recently, in an undated letter received on October 28, 2021, he has said (ECF 1777 at 1): "I would like to apoligize [sic] to the court, to the community, and to my family as well for my actions as a young man." In another letter to the Court, dated December

27, 2021, he has described a nonprofit foundation, called the "We Will Win Foundation," that he has been developing to provide mentorship for troubled youth in Baltimore.  *See* ECF 1808.

In addition, letters received by the Court from relatives and family friends of Fleming's have described how he has grown and matured while incarcerated, accepting responsibility and embracing his opportunity to be a role model for youth in his previous position.  *See, e.g.*, ECF 1768; ECF 1769; ECF 1770; ECF 1833; ECF 1834.

Courts place significant weight on a defendant's post-sentencing conduct because it "provides the most up-to-date picture of [his] 'history and characteristics.'" *Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)).  That said, although rehabilitation efforts can be considered, as noted, rehabilitation alone cannot serve as a basis for compassionate release.  *Davis*, 2022 WL 127900, at *1; *see Lancaster*, 997 F.3d at 175 ("And in considering the § 3553(a) factors, the court can take into account a defendant's conduct after his initial sentencing."); *United States v. McDonald*, 986 F.3d 402, 410-12 (4th Cir. 2021) (noting that on a motion to reduce sentence under the First Step Act, district court must consider defendant's post-sentencing conduct); *United States v. Randall*, 837 Fed. App'x 1008, 1009 (4th Cir. 2021) ("[A] district court must provide an individualized explanation for denying a sentence reduction motion under the First Step Act when the defendant presents evidence of his post-sentencing rehabilitation."); *United States v. Rudisill*, 834 Fed. App'x 827, 829 (4th Cir. 2021) (finding district judge abused his discretion in denying motion under the First Step Act without addressing defendant's post-sentencing conduct).

In addition, I am mindful that defendant's incarceration in the midst of a global pandemic has "sufficiently increased the severity of the sentence beyond what was originally anticipated such that the purposes of sentencing are fully met even with the proposed reduction."  *United*

*States v. Green*, TDC-10-761, 2020 WL 2992855, at *4 (D. Md. June 4, 2020); *see also United States v. Park*, No. 16-cr-00473, 2020 WL 1970603, at *5 (S.D.N.Y. Apr. 24, 2020) (noting that a sentence "that was sufficient but no greater than necessary" may now, in light of COVID-19, become "one immeasurably greater than necessary").

Given the gravity of Fleming's offenses and his disciplinary record, Fleming does not warrant immediate release. However, his medical conditions; intervening changes in sentencing law; the length of his sentence compared to other defendants in this District who have committed similar offenses; and some of his conduct while incarcerated create a basis for a substantial reduction in his sentence. In my view, a reduction from life imprisonment to a sentence of 30 years (360 months) is a reasonable sentence in light of all of the circumstances of this case. *See* ECF 1752 at 22-23.

The First Step Act "does not constrain the Court to decide between immediate release or no reduction at all, and instead leaves the Court discretion in its evaluation of the appropriate sentence once it finds 'extraordinary and compelling reasons.'" *United States v. Braxton*, JKB-09-478, 2020 WL 4748536, at *5 (D. Md. Aug. 17, 2020). Thus, the Court's decision need not be confined either to immediate release or leaving the existing sentence intact. The statutory text of the First Step Act allows courts to "reduce the term of imprisonment" upon a finding of "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A).

Numerous district courts in both this Circuit and others have granted sentence reductions without immediate release. *See, e.g.*, *United States v. Johnson*, RDB-07-0153, 2020 WL 6063733, at *5 (D. Md. Oct. 14, 2020) (reducing sentence from 360 months to 300 months); *Braxton*, 2020 WL 4748536, at *5 (reducing sentence from 246 months to 168 months); *United States v. Marks*, 455 F. Supp. 3d 17, 37-38 (W.D.N.Y. 2020) (reducing sentence from 40 years to 20 years); *United*

*States v. Arey*, Crim. No. 5:05-00029, 2020 WL 2464796 (W.D. Va. May 13, 2020) (reducing sentence but denying immediate release); *United States v. Day*, 474 F. Supp. 3d 790 (E.D. Va. 2020) (same); *see also United States v. Zullo*, 976 F.3d 228, 327 (2d Cir. 2020) ("It bears remembering that compassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's prison sentence . . .").

Accordingly, I find that a reduction in Fleming's sentence, from life imprisonment to 30 years (360 months) for Counts Two and Four, is warranted.  Such a sentence is "sufficient, but not greater than necessary" to comply with the purposes of sentencing.  18 U.S.C. § 3553(a).

## V.  Conclusion

For the reasons set forth above, I shall grant the Motion, in part.  I shall reduce Fleming's sentence to 30 years (360 months) for Counts Two and Four, with the credit as reflected in his BOP records.  *See* ECF 1736-9 at 6.

An Order follows, consistent with this Memorandum Opinion.


Date: March 11, 2022                                       _____/s/_____
                                                                           Ellen L. Hollander
                                                                           United States District Judge